1
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
2

3   ----------------------------------X
                                      :
4   INDIRA KAIRAM, M.D.,              :
                                      : 18-CV-01005 (AT)
5                  Plaintiff,         :
                                      :
6             v.                      : October 30, 2018
                                      :
7   WEST SIDE GI, LLC,                : 500 Pearl Street
                                      : New York, New York
8                  Defendant.         :
    ----------------------------------X
9
              TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
10            BEFORE THE HONORABLE STEWART D. AARON
                    UNITED STATES MAGISTRATE JUDGE
11
    APPEARANCES:
12

13  For the Plaintiff:        ELIZABETH SHIELDKRET, ESQ.
                              67-20 Exeter Street
14                            Forest Hills, New York 11375

15

16
    For the Defendant:        JEFFREY CAMHI, ESQ.
17                            Gordon Rees Scully Mansukhani
                              One Battery Park Plaza
18                            New York, New York 10004

19

20
    Court Transcriber:        SHARI RIEMER, CET-805
21                            TypeWrite Word Processing Service
                              211 N. Milton Road
22                            Saratoga Springs, New York 12866

23

24

25


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service

2

1          THE CLERK:  In the matter of Kairam, M.D. v. West

2   Side GI, LLC, Docket No. 18-CV-1005.

3          Counsel, please state your appearance for the

4   record.

5          MS. SHIELDKRET:  Elizabeth Shieldkret for plaintiff.

6          THE COURT:  Good afternoon.

7          MS. SHIELDKRET:  Good afternoon, Your Honor.

8          MR. CAMHI:  Jeffrey Camhi for defendant.

9          THE COURT:  Good afternoon.  Please be seated.

10          MR. CAMHI:  Good afternoon.

11          THE COURT:  So this matter is being recorded and I

12   note that plaintiff's counsel has provided a glossary to the

13   Court.  In the event that anybody orders the transcript

14   through the court reporters my deputy will provide a copy of

15   the glossary to them so that it will assist them in preparing

16   the tran -- transcript.  So my deputy has that.

17          So this is oral argument on ECF No. 34 which is the

18   motion to dismiss the second amended complaint.  It's been

19   referred to me for a report and recommendation.  So after this

20   argument I'll be issuing a report and recommendation to Judge

21   Torres and as the report and recommendation will indicate the

22   parties would have 14 days thereafter to file any objections

23   to it.

24          So I have read the parties submissions but I thought

25   I'd have the parties in to make any additional points they

1   wanted to make and also I had some questions as we went along.

2   So it's defendant's motion.  So I'll hear from defense counsel

3   first.

4           MR. CAMHI:  Thank you, Your Honor.  As is laid out

5   in our papers, plaintiff has attempted now for a third time to

6   bring this matter before the federal court and to try to make

7   it an appropriate matter to be heard by the federal court.

8           As with her prior attempts plaintiff has failed to

9   adequately plead any claims, let alone federal claims that

10  would make this the appropriate venue for this matter.

11          As laid out in our papers, there are four federal

12  causes of action under the -- first under the Equal Pay Act

13  which if the Court would like me to go through our arguments

14  on those now I can.  If you prefer that you ask questions

15  regarding those arguments I'm okay doing that as well.

16          THE COURT:  Well, the question I have for you is

17  exhaustion is a curable defect.  It's not a basis for a motion

18  to dismiss.  Isn't that right?

19          MR. CAMHI:  Exhaustion is a prerequisite to filing a

20  Title VII and we argue ADEA claim.

21          THE COURT:  Let me just stop you there for a second

22  and let me ask plaintiff's counsel, Ms. Shieldkret.  Do you

23  have a right to sue letter?

24          MS. SHIELDKRET:  No, we do not, Your Honor.

25          THE COURT:  What's the status of proceedings before

4

1  the EEOC?

2         MS. SHIELDKRET:  We have filed with the EEOC I

3  believe 180 days will be November 20th.  The 60 days have

4  already run on the ADEA claim.

5         THE COURT:  And there's no right to sue letter?

6         MS. SHIELDKRET:  Correct, Your Honor.

7         THE COURT:  Okay.

8         MR. CAMHI:  We would just note on the ADEA claim

9  while 60 days have now run they have not run at the time that

10  the initial complaint was filed.

11         THE COURT:  Okay.  Go ahead.

12         MR. CAMHI:  Plaintiff makes the point in her

13  opposition that one of the reasons, not the main reason for

14  filing without the right to sue letter is a rapidly shifting

15  environment which should excuse a failure to exhaust her

16  administrative remedies but we -- we question whether such an

17  environment exists.  Plaintiff not only ties that to her age

18  which I believe is 67 although I don't know her birthday so

19  she may be 68.  Again, she's two years away from the alleged

20  mandatory retirement age which our client maintains has not

21  been implemented in any manner at this point in time.

22         So that was the basis for plaintiff's argument that

23  the rapidly shifting environment excuses failure to exhaust

24  administrative remedies.  First off, her age discrimination

25  claim is not part of her Title VII claim of course.  So such

1    an argument does not hold weight with regard to the Title VII

2    claim and secondarily with the ADEA claim that rapidly

3    shifting environment doesn't exist.  So there's no

4    justification for waiving or excusing a failure to exhaust the

5    administrative remedies requirement.

6                    THE COURT:  Okay.

7                    MR. CAMHI:  That said, given that the -- given that

8    the administrative remedies have not been exhausted defendants

9    obviously move to dismiss on that basis both the Title VII and

10   the ADEA claims.

11                   THE COURT:  Okay.

12                   MR. CAMHI:  I don't know that if wholly answers your

13   question in that regard.

14                   THE COURT:  It does.  Thank you.  Anything else you

15   want to point out about any of the other claims?

16                   MR. CAMHI:  Sure.  On the -- on the EPA claim, as

17   noted in defendant's papers -- and actually as noted in

18   plaintiff's opposition the underlying purpose of the Equal Pay

19   Act is to remove the imbalance and bargaining power between

20   men and women.  As alleged in the second amended complaint,

21   both plaintiff and a male doctor who plaintiff holds out as a

22   comparative party or individual were offered allegedly the

23   same amount of money to do work that plaintiff alleges was

24   similar.  Here, there's no imbalance and bargaining power to

25   the extent both individuals were offered the same salary that

6

1   -- there is no basis for an Equal Pay Act claim.

2          Additionally, plaintiff actually fails to make out

3   that the individual to whom she points at as a comparable

4   employee was actually doing similar work.  The second amended

5   complaint indicates that a Dr. Distler was paid to run the

6   Gould Practice which involved administrative duties.

7   Plaintiff does not elaborate as to any other duties that were

8   involved in running an entire practice, does not elaborate on

9   the administrative duties that Dr. Distler was required to

10  perform and does not compare those administrative duties to

11  the administrative duties that plaintiff alleges that she

12  performed with regard to the billing for West Side.

13         So based on the lack of a comparator, based on a

14  lack of difference amongst the salaries offered to these

15  employees, defendants obviously move that the Equal Pay Act be

16  dismissed as well.

17         And I'll touch quickly on the trade secrets claim.

18  The owner of the trade secret must allege that in this case

19  she had taken reasonable measures to keep that information

20  secret.  Plaintiff must show unconsented disclosure or the use

21  of secret by someone who obtained it improperly or at the time

22  of disclosure, knew the trade secret was acquired through

23  improper means.  There's no such allegation with regard to

24  West Side.  The allegations in the complaint specifically

25  allege that plaintiff provided West Side with a template that

7

1   she prepared with an outside organization.  There's no

2   indication that plaintiff advised West Side that this was

3   some -- this contained proprietary information or methods or

4   that this template was in fact a trade secret.  Plaintiff made

5   no attempt to secure a promise from West Side to maintain the

6   secrecy of this template and plaintiff has failed to allege

7   that the value of the template is decreased by West Side's

8   access to it.  Plaintiff is still free to use the template.

9          In the hypothetical situation where plaintiff

10  obtained a different job outside of West Side she would not

11  lose out on any finances because she would still be allowed to

12  use this template.  The value of the template such that it is

13  is not reduced by its access to multiple parties.  So for

14  those reasons defendants move that the Trade Secrets Act claim

15  be dismissed as well.

16         Upon those bases were all federal claims to be

17  dismissed defendants then move that the Court not extend

18  jurisdiction over the state and city law claims which to the

19  extent the Court does defendants in their papers -- in our

20  papers move that those claims as well be dismissed but I will

21  leave questions for that to Your Honor.

22         THE COURT:  Okay.  Thank you.  So, Ms. Shieldkret,

23  what -- why don't I hear from you.  So from the Court's

24  reading of Second Circuit precedent, which obviously is

25  binding on this Court, there is an exhaustion requirement both

8

1   for Title VII and ADEA claims and on the face of your initial

2   complaint you note that you didn't have a right to sue letter

3   and in your second amended complaint you indicate -- excuse

4   me.  In your reply papers you state that you filed on May 23,

5   2018 the day before you filed the SAC, the second amended

6   complaint you filed with the EEOC.  Why isn't that a basis for

7   dismissal?

8          MS. SHIELDKRET:  Your Honor, I don't think the

9   Second Circuit says that it's required and I don't think the

10   EEOC will issue a right to sue letter on any ADEA claim.

11   Those claims are just ripe 60 days after the filing with the

12   administrative agency.  I can go back and check with them on

13   their procedure but I don't think that's a correct statement

14   of the Second Circuit law.

15          THE COURT:  So what you're saying is you needed to

16   file with the EEOC but at the time you commenced the action

17   you hadn't?

18          MS. SHIELDKRET:  Correct.

19          THE COURT:  Okay.  So you think that's curable?

20          MS. SHIELDKRET:  Yes, Your Honor.  The Second

21   Circuit in -- has said that all that would happen in a case

22   where you don't have the right to sue letter is it must be

23   dismissed without prejudice and then plaintiff can get the

24   letter and sue and in this situation --

25          THE COURT:  So first let's stick with ADEA for a

9

1   second.  So the ADEA claim you say that it's curable because

2   the time period is now lapsed and even if the Court were to

3   dismiss without prejudice you could simply refile which would

4   be a waste of judicial resources.

5           MS. SHIELDKRET:  Correct, Your Honor.

6           THE COURT:  So now let's talk about Title VII.  So

7   what about that?  If you didn't have a right to sue letter

8   before you filed why isn't that a basis for dismissal?

9           MS. SHIELDKRET:  So that's the Booze v. Runun case

10  from the Second Circuit that said you really should look at

11  the judicial economy of this situation.  Here I'd like to just

12  be on the factual situation.  What was changing is there is

13  still a pending deal with PE and --

14          THE COURT:  I'm sorry.  I didn't hear what you said.

15          MS. SHIELDKRET:  There's still a pending deal for a

16  third party PE to buy shares in West Side and PE is putting

17  requirements on the doctors.  For example, how many hours

18  they're going to work that are not requirements that are

19  currently on the doctors.  So we have a situation where the

20  actual terms and conditions of employment are changing and

21  while the deal hasn't closed we've been getting different

22  stories since February about what those terms and conditions

23  are going to be, and that's what precipitated filing the

24  complaint on this -- knowing that we had the state claims are

25  ripe and that the federal claims under Booze were certainly --

1  it made judicial economy, it made sense to have them

2  altogether.

3         THE COURT:  Well, let me ask you this question.  The

4  first complaint you filed in this case didn't have any federal

5  claims; right?

6         MS. SHIELDKRET:  I believe that's right.

7         THE COURT:  So why didn't you simply refile in state

8  court once Judge Torres pointed out that the citizenship of an

9  LLC is based upon the citizenship of each of its members?  Why

10  don't you just go across the street to state court and file?

11         MS. SHIELDKRET:  Well, we knew the federal claims

12  were coming and one of the issues is because PE is going to be

13  setting terms and conditions of employment getting

14  jurisdiction over them.  So an out of state party is actually

15  the party and we did file -- in our charge in the EEOC we did

16  name PE as well.

17         MR. CAMHI:  Your Honor, I'd like to just point out

18  if I could that PE has not -- the terms of the sale to PE have

19  not been finalized.  No vote has been taken as to whether or

20  not to proceed with the sale.

21         THE COURT:  Well, all this is outside the record of

22  what's before the Court.  The Court's going to be making its

23  ruling based upon what's pled, not what the parties --

24         MR. CAMHI:  To the extent the plaintiff is claiming

25  that they needed to rush this before the Court without filing

11

1  with the EEOC --

2         THE COURT:  I understand.  So the first federal

3  claim you added in the first amendment was strictly an Equal

4  Pay Act claim; right?

5         MS. SHIELDKRET:  Correct, Your Honor.

6         THE COURT:  But as has been pointed out the -- your

7  argument seems to be that our client simply didn't get paid

8  but the board had approved your salary, your client's salary

9  at the same amount that Dr. Distler was paid, right, the

10  100,000?

11         MS. SHIELDKRET:  Correct.

12         THE COURT:  So how does that an EPA claim as opposed

13  to a claim for failure to receive $100,000?

14         MS. SHIELDKRET:  So as the --

15         THE COURT:  It could be in the nature of a contract

16  claim.

17         MS. SHIELDKRET:  As the Court in Corning points out,

18  it's the actual pay that the parties receive that matters and

19  this is a case where we believe the motivation was that they

20  thought that they could do this to her because she was a

21  woman.

22         Now, under the EPA that's actually not an element of

23  the cause of action.  We don't have to prove animus but what

24  makes this different from a regular contract claim is the

25  actual facts of this case, the situation.

12

1          THE COURT:  So you're saying any time a woman is the

2     party who hasn't received payment then there's an Equal Pay

3     Act claim in addition to a breach of contract claim?

4          MS. SHIELDKRET:  I don't think we're going that far.

5     I think we're saying that in this case the parties, the people

6     who were involved it does seem that that was the motivation

7     for them.  It may -- at least at the pleading stage I think we

8     can make that out.  Whether -- beyond that when they come in

9     with their defenses we'll have to see.  So I don't think we

10    have to say that any claim where a woman doesn't get paid is

11    an Equal Pay Act claim but we believe we've pleaded an Equal

12    Pay Act claim in this case.

13          THE COURT:  Okay.  What were the duties that were

14    performed by Mr. -- by Dr. Distler?

15          MS. SHIELDKRET:  Sure.  So there is some of that

16    discussion in the complaint and one of the things that he was

17    charged with doing was the administrative task of choosing

18    doctors to perform different procedures.  What this all goes

19    to is making sure that the claims -- for example, when you're

20    choosing a doctor you want to make sure that they're qualified

21    for the insurance that that patient has.  So it's really what

22    we call -- what doctors call capture for the billing, making

23    sure that everything that you're doing is going to get billed.

24          When you look at what Dr. Kairam's administrative

25    duties were it was also to improve the billing process to

13

1  capture the billing and to make sure that everything that they

2  were doing in the center was going to get billed.  They had

3  very similar roles and we're not claiming that they were doing

4  exactly the same things but that they were comparable.

5          THE COURT:  Okay.  It seems like a round peg in a

6  square hole to me but let's move on to Title VII which -- what

7  are you basing your Title VII claim on, sex, race, national

8  origin?

9          MS. SHIELDKRET:  Sex, national origin and -- this

10 has to do with the way the cases were being distributed.  One

11 thing that might help is most -- the way the center runs, the

12 doctors brings their own cases to the center but there was a

13 practice that they -- the doctors acquired and that's where

14 Dr. Distler was giving out cases to the doctors to be

15 performed at the center and he systematically gives cases both

16 to the older doctors and to Dr. Kairam and when she asked at a

17 meeting -- and this is in the complaint -- in front of

18 everyone he told her she didn't look like the doctor that they

19 had bought the practice from.

20         THE COURT:  So the two doctors who didn't get cases

21 were your client and is the male doctor that's near the newly

22 -- or the doctor that was near the newly enacted were

23 terminated --

24         MS. SHIELDKRET:  Correct.

25         MR. SILVER:  -- reading from the second amended

14

1  complaint, Paragraph 28.   Was that Dr. Myron Goldberg?

2           MS. SHIELDKRET:  Yes, Your Honor.

3           THE COURT:  So he's a male?

4           MS. SHIELDKRET:  Yes.

5           THE COURT:  And is he a white male?

6           MS. SHIELDKRET:  I believe so, Your Honor.

7           THE COURT:  So he was discriminated against as well?

8           MS. SHIELDKRET:  He was -- yes, he was excluded

9  because of his age.  They didn't want to build up his numbers

10 of patients that he was doing at the center.

11          THE COURT:  And the adverse employment action that

12 you're alleging is the lack of referrals from Dr. Gould's

13 practice.  Is that right?

14          MS. SHIELDKRET:  Correct.

15          THE COURT:  Am I right that Dr. Kairam continued to

16 receive income as a member of WSGI in connection with the

17 medical procedures she performed?

18          MS. SHIELDKRET:  She received income in proportion

19 to her ownership interest in WSGI, not the cases she

20 performed.

21          THE COURT:  Okay.  And I know that she has issue

22 with respect to her membership interest.  She thinks it ought

23 to be greater; right?

24          MS. SHIELDKRET:  Correct.

25          THE COURT:  That's not a federal claim; right?

1   That's a state claim, a state law claim?

2          MS. SHIELDKRET:  Correct, Your Honor.  I would say

3   that there are sort of two categories of claims in this

4   action.  There are claims related to the employment terms and

5   conditions and then there are claims related to the business

6   relationship between and among the parties.  And that would

7   fall into the more of the business relationship.

8          THE COURT:  What was the former?

9          MS. SHIELDKRET:  The discrimination claims.  The

10  terms and conditions of the employment, the retirement age,

11  how the cases were distributed --

12         THE COURT:  Let's talk about the retirement age

13  because we haven't spoken about ADEA.  That affected persons

14  age 70 and older; right?

15         MS. SHIELDKRET:  That -- it was a mandatory

16  retirement at age 70 but what we're saying is -- and if you

17  look at the operating agreement, and this is in our brief, if

18  you want to transition your practice it takes at least two

19  years to bring someone on, get them credentialed by insurance

20  and then WSGI's requirement is that they have two years of

21  practice in WSGI before you can transition your shares to that

22  person.

23         So what they've really done -- and that's after you

24  find the person.  What they really did -- have done by

25  enacting it so close to her being 70 is she's already being

1   affected because she can't do that in the amount of time they

2   allotted.  And when she talked to her colleagues about selling

3   her shares they already understood that we can force you out

4   at 70.  Your shares don't have the same value as a younger

5   person who we might want to buy out.

6                THE COURT:  But somebody could stay on after 70;

7   right?  Even -- by the way, this policy has [inaudible], has

8   it?

9                MS. SHIELDKRET:  There's a dispute about that.

10               MR. CAMHI:  Correct, Your Honor.  Your Honor, I just

11  want to point out that when you asked plaintiff's counsel

12  whether people at 70 are affected by this policy, plaintiff's

13  counsel is unable to say no because the policy has not been

14  implemented.  It's not alleged to have been implemented in the

15  complaint.  It has not been applied to any individual and as

16  noted in our papers the harm alleged in the ADEA claim is

17  purely speculative at this point.

18               THE COURT:  So it's part of the PE deal; right?

19               MS. SHIELDKRET:  So there's two things going on.

20  First of all, we do allege that it's been implemented in the

21  complaint and defendants already conceded that because they --

22               THE COURT:  I'm not sure you have allege it's been

23  implemented.  Why don't you show me where that is?

24               MS. SHIELDKRET:  Sure.

25               MR. CAMHI:  And I don't believe we've conceded that,

17

1    Your Honor.

2                    [Pause in proceedings.]

3            MS. SHIELDKRET:  So Paragraph 38.

4            THE COURT:  Hold on -- I have to pull up the

5    unredacted one.

6            MS. SHIELDKRET:  PE also required terms --

7            THE COURT:  I'm sorry.  Just tell me the paragraph

8    again.

9            MS. SHIELDKRET:  Paragraph 38.

10                   [Pause in proceedings.]

11           MS. SHIELDKRET:  I'm sorry.  It's --

12                   [Pause in proceedings.]

13           THE COURT:  That's what I was saying.  That's in the

14   PE -- the terms of the PE deal.

15           MS. SHIELDKRET:  Hang on.

16                   [Pause in proceedings.]

17           MS. SHIELDKRET:  And that in the beginning of that

18   the West Side actively pursued illegal policies which

19   aggressively targeted older members to alienate them of their

20   interests, inhibit or prevent them from practicing medicine

21   with another group after the age of 70 and discriminate

22   against them in the proposed sale to PE.

23           THE COURT:  Right.  In the proposed sale to PE which

24   hasn't happened.

25           MS. SHIELDKRET:  But they also, like I said, they

1   targeted older members to alienate them of their interest.

2   What they said is at 70 you're gone and we get your shares

3   back.

4         THE COURT:  But what you're complaint alleges is

5   that this is going to be a term of the PE -- of the so-called

6   proposed sale to PE but the proposed sale to PE has not

7   happened.

8         MS. SHIELDKRET:  Okay.

9         MR. CAMHI:  I actually think that --

10        MS. SHIELDKRET:  That's actually not correct, Your

11  Honor.

12        MR. CAMHI:  If I can clarify that the sale to PE

13  would potentially involve a requirement that members stay on

14  for seven years from the date of sale and so the alleged

15  mandatory retirement age of 70 is separate from that.

16  Actually it's our position that West Side's willingness to

17  consider PE's proposed term of seven committed years per

18  member flies directly in the face of the allegation that

19  they've implemented this mandatory retirement at 70.

20        THE COURT:  Again, I'm just sticking to what's in

21  the complaint.

22        MR. CAMHI:  Understood.

23        THE COURT:  But I do have a very narrow question.

24  Has the PE deal happened?

25        MR. CAMHI:  No, Your Honor.

19

1          MS. SHIELDKRET:  No.  Your Honor, if you look at

2   Paragraph 30 --

3          THE COURT:  Which one?

4          MS. SHIELDKRET:  Paragraph 30 of the -- from the

5   amended complaint.

6                    [Pause in proceedings.]

7          MS. SHIELDKRET:  What it says is they told the

8   members the board had voted to institute the policy that

9   required mandatory retirement for members and cashing out

10  their units for the value in the capital accounts at age 70.

11  So --

12         THE COURT:  But it doesn't say that the policy was

13  instituted.  While they may have --

14         MS. SHIELDKRET:  So what I'm --

15         THE COURT:  Let me finish.  While they may have

16  voted to do it because that was part of getting this PE deal

17  it doesn't say it was implemented.  In fact, you know that it

18  hasn't been implemented; right?

19         MS. SHIELDKRET:  Your Honor, the operating agreement

20  -- and this is the part that they've already conceded.  The

21  only thing that has to happen for that policy to go into

22  effect is for the board to vote it into effect.  So they've

23  made -- what it looks like they've done is they made an

24  exception for Dr. Goldberg but this was actually not done as

25  part of the PE deal.  This was done to alienate the shares

1   before the PE deal went through so that the remaining doctors

2   would get more value.  These people, the people at the age of

3   70 would be cashed out from the amount in their capital

4   accounts and the doctors who got those shares would be paid

5   the PE valuation price.

6           THE COURT:  So let me read to you Paragraph -- the

7   paragraph -- in Paragraph 38 the second sentence says "PE also

8   required terms which it knew to be discriminatory and to have

9   a disparate impact on WSGI members at or near the age of 70

10  and the WSGI board indicated we accept the illegal terms even

11  after Dr. Kairam, Dr. Goldberg voiced concern the terms had

12  discriminatory disparate impact on the older doctors."

13          So what your second amended complaint alleges is

14  that this issue about discriminating against doctors over age

15  70 was a PE driven requirement.  That's what your complaint

16  says.

17          MS. SHIELDKRET:  No, Your Honor.  What we say first

18  in Paragraph 30 is that West Side passed it -- passed the

19  mandatory retirement age as part of alienating the shares to

20  get more money out of the BE deal.  PE came along and they

21  actually wanted --

22          THE COURT:  That actually isn't what it says.

23  You're adding things.  I'm reading Paragraph 30.

24          MS. SHIELDKRET:  It says they implemented -- it says

25  that they voted --

21

1             THE COURT:  They voted to institute a policy.

2             MS. SHIELDKRET:  Right.

3             THE COURT:  Your client is still working at WSGI, is

4   she not?

5             MS. SHIELDKRET:  Yes, she is.

6             THE COURT:  And she continues to get paid.  How much

7   is she making a year?

8             MS. SHIELDKRET:  I don't know exactly but it's

9   been --

10             THE COURT:  Six figures?

11             MS. SHIELDKRET:  Yes, it's been varying --

12             THE COURT:  Okay.  She's making six figures.  She

13   knows what's happening.  That policy has not yet been

14   implemented, isn't that right?

15             MS. SHIELDKRET:  No doctor has been forced to retire

16   but they have -- to retire but they have never said that the

17   policy isn't in effect.  What they've said is --

18             THE COURT:  But they also -- your own pleading says

19   it's going to go into effect at the time when the PE deal --

20   it's a part of the PE deal.

21             MS. SHIELDKRET:  The --

22             THE COURT:  Right?

23             MS. SHIELDKRET:  No, Your Honor, I disagree.  What I

24   think you're pointing out is if we need to we could make it

25   more clear but two different things happened.  In August 2016

22

1  the board voted --

2          THE COURT:  2017?

3          MS. SHIELDKRET:  20 -- I think it was 2016

4  because --

5          THE COURT:  I'm looking at Paragraph 30, Page 7 of

6  21.

7          MS. SHIELDKRET:  I'm sorry.

8          THE COURT:  It says by August of 2017.

9          MS. SHIELDKRET:  Okay.  So in August 2017 the board

10 voted.  That policy went into effect because the only thing

11 that is necessary under the operating agreement -- this is

12 quoted from defendant is for the board to vote.  So it's a

13 part -- the operating agreement has been amended to include a

14 legal requirement policy.

15         THE COURT:  So the second sentence of Paragraph 30

16 says "After a protest from Dr. Myron Goldberg, a doctor

17 already over 70, the board stated the policy would allow

18 doctors over 70 to continue practice subject to an annual

19 review."

20         MS. SHIELDKRET:  Right.  So that's --

21         THE COURT:  So it's a policy that isn't really a

22 policy.

23         MS. SHIELDKRET:  It's a policy that still

24 distinguishes the terms and condition of employment based on

25 age.

1        THE COURT:  And it affects people over age 70?

2        MS. SHIELDKRET:  70 and over, yes.

3        THE COURT:  Okay.

4        MS. SHIELDKRET:  And what I'm saying is there's also

5   -- and these terms are incompatible and this is part of the

6   problem of retirement planning which is affecting Dr. Kairam

7   right now.  She had a path to retirement under the existing

8   operating agreement before these amendments where she could

9   slowly work less over time.  She had control over that

10  schedule and she could phase out her practice.  She could

11  bring someone in but she had a lot of flexibility.  She joined

12  this ASE at age 63.  Everyone understood that that was

13  something that was going to happen eventually and now what

14  they said is -- first they said well, you have to stop

15  completely and you can't even go anywhere else.  We're putting

16  a non compete on you and now that --

17        THE COURT:  That's not -- is that anywhere in this

18  complaint?

19        MS. SHIELDKRET:  That is the policy that they passed

20  on the board.  So what --

21        THE COURT:  Is that anywhere in this complaint?

22        MS. SHIELDKRET:  It's Exhibit 2 is the -- is the

23  complete operating agreement to this complaint.  We put in the

24  cover page but we're incorporating by reference the complete

25  operating agreement and that's an amendment to the operating

1   agreement, Your Honor.

2         THE COURT:  Claims based upon the alleged non

3   compete, are those anywhere in the second amended complaint?

4         MS. SHIELDKRET:  Yes, in the declaratory judgment

5   portion because we're saying that those terms including the

6   non compete are non enforceable.

7         THE COURT:  So --

8         MS. SHIELDKRET:  I think that's Count 6.

9         THE COURT:  -- you haven't pled a claim alleging an

10  issue with the non compete.

11        MS. SHIELDKRET:  We -- in the declaratory -- we

12  haven't pled damages based on the non compete.  What we've

13  said is that that's affecting her ability to move somewhere

14  else and alienate her shares, yes.

15        THE COURT:  The way you bring a claim based on the

16  non compete is you go to work somewhere else or get an offer

17  to work somewhere else and then you can seek relief.  What

18  this complaint pleads is that you were looking to leave --

19  excuse me, your client was looking to leave and the way that

20  she was induced to stay was by being promised that she was

21  going to be paid money to make up for what she thought the

22  wrongful -- that her interest wasn't valued properly and that

23  they also promised to pay her $100,000 a year for performing

24  these administrative tasks.

25        Again, state law based claims that are either in the

25

 1   nature of estoppel based claims or fraud based claims or

 2   contract based claims, not claims under federal law in the

 3   court's view but go ahead.

 4           MS. SHIELDKRET:  So what's happened now is there's

 5   actually been a whipsaw effect.  PE wants the opposite.  They

 6   want the doctors to stay.  They want them locked in and they

 7   want to set min -- very high minimums.  They want them full

 8   time.  So that also affects her ability to retirement plan

 9   now.  This isn't about turning 70.

10           THE COURT:  That's not in the second amended

11   complaint; right?

12           MS. SHIELDKRET:  That's what Paragraph 38 is

13   referencing.

14           THE COURT:  Paragraph 38, the one that says it was

15   PE's idea to put in the age 70 requirement?

16           MS. SHIELDKRET:  No.  It's not about -- it wasn't

17   PE's idea to put in the age 70 requirement.  PE wants the

18   opposite.  PE also in addition to the age 70 requirement which

19   is in effect.  PE's also taking -- wants contrary terms.

20           THE COURT:  I'm looking at Paragraph 38.  So show me

21   where it is you're talking about.

22           MS. SHIELDKRET:  PE also required terms which it

23   knows to be discriminatory and to have a disparate impact on

24   WSGI members at or over the age of 70.  And the board -- West

25   Side's board indicated that it will accept the illegal terms.

26

1   The disparate impact that it has is now she can't retire.

2   They want her locked in.  So it's actually a -- a complete 180

3   in terms of her retirement planning.  It went from being you

4   must retire at 70, get out, to you have to stay for at least

5   five years and we have control over how many hours you work.

6         THE COURT:  Where does this paragraph state she has

7   to stay five years?

8         MS. SHIELDKRET:  Okay.  The reason that it's not in

9   there, Your Honor, is because we just found out these terms.

10  They have not been telling us the terms and that's what we

11  mean when we say there is a change going on.  There is an

12  equitable reason why we couldn't put this in and that's

13  because they weren't telling us what the terms were.  So

14  that's the rapidly changing environment.  That's something

15  that we learned last month.

16        MR. CAMHI:  Your Honor, I'd just like to point out

17  again the board has not voted on a sale to PE.  So it has not

18  adopted these alleged terms.  And second of all, plaintiff's

19  counsel is now arguing essentially that the mandatory

20  retirement age is a moot issue because her client would have

21  to stay on for five years.

22        MS. SHIELDKRET:  No.  What I'm saying is what PE is

23  doing, the terms now is if she -- they could do both.  They

24  can force her to retire at 70 and the PE terms for not staying

25  the full five years are punitive.  She doesn't even get this

27

1   money in her capital account.  They'll cash her out for less

2   than that.  It's a complete 180.  These are terms that are

3   incompatible.  That's why there's a disparate impact on the

4   older doctors right now.  It can't be both.

5           THE COURT:  All the Court can do -- all this Court

6   will do is issue a report and recommendation with respect to

7   what's alleged in the second amended complaint.

8           MS. SHIELDKRET:  And what I'm saying, Your Honor, is

9   that this complaint incorporates by reference the fact that

10  the amendment to the operating agreement, it incorporates the

11  entire operating agreement which includes that they've put

12  into place a retirement -- an illegal mandatory retirement age

13  of 70 and that --

14          THE COURT:  But your complaint then says that it's

15  not an actual retirement age because Goldberg was kept on.

16          MS. SHIELDKRET:  What it says is that the doctors

17  are being treated differently based on age and what they can

18  do is tell her at 70 that you have to go and you're cashed

19  out.

20          THE COURT:  Right.  When she turns 70 they can do

21  that.

22          MS. SHIELDKRET:  Right.  And what they can do is

23  because these shares are restricted is not pay her the value

24  of the shares because they know they can just wait and cash

25  her out at 70.

1            THE COURT:  Okay.  Anything else on the Equal Pay

2    Act Title VII or ADEA claims?

3            MR. CAMHI:  I have one more comment if I may, Your

4    Honor.

5            THE COURT:  Why don't I first hear from plaintiff's

6    counsel and then I'll give you a chance for rebuttal but there

7    are other claims I want to discuss.

8            MS. SHIELDKRET:  Sure.  Well, I would just like to

9    point out that even the kinds of things you're talking about,

10   information that we didn't have when we drafted the second

11   amended complaint can be cured and the standard on a

12   discrimination claim is not even making out a prima facie

13   case.  That's not what's required.

14           THE COURT:  You don't have to make out a prima facie

15   case?  What kind of case do you need to make out?

16           MS. SHIELDKRET:  You need to make out something that

17   is plausible but the Second Circuit in EEOC v. Port Authority

18   citing Swierkiewicz, a Supreme Court case says, it is not

19   necessary to plead all the items of -- all of the elements of

20   a prima facie case on a discrimination claim, that failure to

21   plead one element is not the basis for dismissing the claim.

22           So it really is a totality and what we're saying is

23   yes, there have been changes.  There are still changes and

24   that's part of what the problem is for someone who is so close

25   to retirement.  This has a disparate impact.  A younger

29

1   doctor, none of this affects them.  All of these circumstances

2   doing a whipsaw of changing 180 degrees is not going to affect

3   a doctor in their 40s.  They'll stay or leave based on factors

4   that have nothing to do with their age.  It was the older

5   doctors that were targeted and the animus came in passing a

6   policy that was on its face illegal and discriminatory of

7   mandatory retirement policy at age 70 and that's the animus

8   there.

9           The fact that they're willing to change it because

10  now they have a suitor that wants the doctors to stay doesn't

11  make it any less difficult for the older doctors to find their

12  path of how they want to retire and really what made sense all

13  along for her in joining this practice was to taper off, and

14  that's what she had planned to do and neither one of those

15  policies allows that.

16          THE COURT:  So your complaint says that there was

17  this age 70 policy that PE required and now you're saying that

18  PE is no longer requiring the age 70 requirement -- no longer

19  has the age 70 requirement and the PE transaction hasn't even

20  closed but that PE wants to institute a policy 180 degrees

21  opposite where she actually -- your client needs to stay on

22  past age 70.  Is that what you're saying?

23          MS. SHIELDKRET:  The only thing I would disagree

24  with is the first para -- the first sentence of Paragraph 38.

25  West Side passed the discriminatory policy without -- we have

1   no way of knowing but it seems to be that it was without PE's

2   input.  What PE wanted was the doctors to stay on.

3       THE COURT:  The first sentence of Paragraph 38 reads

4   "WSGI actively pursued illegal policy which aggressively

5   targeted older members to alienate them of their interests,

6   inhibit or prevent them from practicing medicine with another

7   group after the age of 70, and to discriminate against them in

8   the proposed sale to PE."

9       MS. SHIELDKRET:  Right.  And all I'm saying is that

10  "and" means each of those things individually.  I understand -

11  - and I understand it's a perfectly valid reading of the

12  sentence to say that "and" goes with the first two things.

13  But we're saying they did one, two and three.

14      THE COURT:  Then the next sentence says --

15      MS. SHIELDKRET:  Each of those things.

16      THE COURT:  -- "PE also required terms which it knew

17  to be discriminatory and to have a disparate impact on WSGI

18  members at or near the age of 70 and that WSGI board indicated

19  it would accept the illegal terms even after Dr. Kairam and

20  Dr. Goldberg voiced concerns that the terms had a

21  discriminatory impact on their older doctors."

22      So, again, this is precatory language.  This is not

23  -- this is language that says that they would accept these

24  terms and implicit there is that if the PE deal closed.

25  Right?  I mean this paragraph -- this part of Paragraph 38 has

1    not come into fruition.  In fact, you're claiming now that the

2    proposed deal has changed.

3              MS. SHIELDKRET:  Right.  But which she was told.

4    What the consistent thing that she was told, and I'm looking

5    for it in the complaint is it's going to be take it or leave

6    it.

7              THE COURT:  What's going to be take it or leave it?

8              MS. SHIELDKRET:  The deal, that they're not going to

9    do anything to address the disparate impact on the doctors

10   here.

11             THE COURT:  But, again, what we're talking about is

12   something that may or may not happen.  All this Court can do

13   is rule upon the second amended complaint that's before --

14   this is your complaint, what is it, third complaint?  And it

15   was filed --

16             MS. SHIELDKRET:  In May.

17             THE COURT:  -- in May of 2018.  So all the Court can

18   do is base its ruling based upon what you've pled; right?

19             MS. SHIELDKRET:  Correct, Your Honor.

20             THE COURT:  And all sorts of things can happen after

21   I issue my report and recommendation.  I suppose that the PE

22   deal could change yet again.  The PE deal may never close.

23   Your client may have various claims that she wishes to assert

24   once the PE deals closes but right now is this even a ripe

25   controversy, these ADEA based claims, the age discrimination,

32

1   employment act claims?

2        MS. SHIELDKRET:  Yes, Your Honor, and it's because

3   of -- in the operating agreement it says you need at least two

4   years before you can transition someone from your practice and

5   that was something that was sprung on her with not a lot of

6   time to be able to transition with the existing operating

7   agreement.  So yes, it's already ripe because she can't take

8   advantage of the things she bargained for.

9        THE COURT:  Ah, what she bargained for.  Isn't that

10  a contract?

11       MS. SHIELDKRET:  The terms and condition no, because

12  it affects the terms and conditions of employment.  So what's

13  going on is she went in at age 63 or 64 and had this

14  understanding based on the operating agreement that she could

15  taper off cases and hand them off to someone over time and

16  then with not enough time to do that.  For example, to say I'm

17  going to practice until I'm 73 but I'll practice half days or

18  fewer cases a month.  They said no, you're not going to be

19  able to do that at 70 and now you have to -- you have very

20  little time to do the retirement planning, and that's why even

21  at age 67 this has a disparate impact of an employ -- on an

22  employee of that age.  It's a ripe claim today.

23       THE COURT:  Doesn't there need to be an adverse

24  employment action in order for you to have a claim under ADEA?

25       MS. SHIELDKRET:  The adverse employment action is

1  the threat that they're going to take the shares away.

2  They've already -- and so what that's done is it's made her

3  value, her compensation has changed, her total compensation

4  because she can never get the value out of the shares the way

5  a younger employ -- a younger employed person can.

6          THE COURT:  So the adverse employment action is

7  they've threatened her in some way.

8          MS. SHIELDKRET:  It's already happened.  It's not

9  the same -- she's already lost the economic value.  That's the

10  part where the -- where she went and talked and we plead this.

11  She went and talked to her colleagues and they don't want to

12  pay what they -- there's now an appraisal --

13          THE COURT:  What they promised to pay.

14          MS. SHIELDKRET:  There's an appraisal for the

15  company and you can only transfer shares in accordance with

16  the appraisal.  They will not pay the appraised value because

17  they know they can wait her out and just cash her out at 70.

18  So it's already happened.  She can't get the value today

19  because of this illegal employment claim.

20          THE COURT:  She can't get the benefit of her

21  bargain; right?

22          MR. CAMHI:  Your Honor --

23          MS. SHIELDKRET:  She can't get the total --

24          THE COURT:  Let me get an answer to the question.

25          MS. SHIELDKRET:  She can't get the total

34

1   compensation as an employee doing cases.

2          THE COURT:  What she had been promised she can't

3   get.

4          MS. SHIELDKRET:  Any employment -- any employee who

5   comes in they're not getting the bargain of their employment

6   terms and conditions when they come in with a discrimination

7   case.  I mean that's true but that doesn't mean that it's only

8   a contract issue.  It's also a discrimination case because

9   this was based on age.

10          THE COURT:  Why didn't you plead an ADEA claim in

11   your first amended complaint?

12          MS. SHIELDKRET:  We actually were -- we knew that

13   the transaction was -- we had been told the transaction was

14   going to close at the end of February.  We actually were

15   looking for the documents of what the retirement age -- what

16   they had done, what the board had done.  We were searching for

17   that.

18          THE COURT:  So you were waiting for the PE deal to

19   close?

20          MS. SHIELDKRET:  No, we were looking back to find

21   the emails.  We needed to get something on file because we

22   thought the PE deal was closing and it's not in there

23   essentially because we were just rushed and we needed to find

24   the documents from August 2017 that showed that the operating

25   agreement had been amended, and that's now part -- that's the

1  thing that we reference in this complaint.  There's actually a

2  covering email and the board says this is the policy we

3  passed.

4          THE COURT:  The policy that isn't a policy because

5  she can stay on after 70; right?

6          MS. SHIELDKRET:  I don't think that's a fair

7  characterization because --

8          THE COURT:  That's what you say.  That's what your

9  complaint says.

10          MS. SHIELDKRET:  My complaint says that it's

11  possible but it's completely at their discretion.  That's not

12  the way younger employees are treated.  My complaint says that

13  that policy itself is -- a yearly review is discriminatory.

14  It doesn't mean that it's impossible to stay on.  What it

15  means is if you want to stay on you're automatically subject

16  to discriminatory terms based on your age.  That's what the

17  problem is and that's all in the complaint.

18          THE COURT:  Right  That's a problem when you turn

19  age 70; right?

20          MS. SHIELDKRET:  Yes.

21          THE COURT:  Mr. Camhi.  I know that's not the way

22  you pronounce it.  That's the way I pronounce it.

23          MR. CAMHI:  Fair enough.  Nobody has ever pronounced

24  it the way I pronounce it.

25          THE COURT:  I used to work with somebody, may he

1    rest in peace, named Steve Camhi.  So but go ahead.

2          MR. CAMHI:  There were just two things I wanted to

3    touch on.  One --

4          THE COURT:  I still have other questions on some of

5    the other claims but I'll let you briefly comment.

6          MR. CAMHI:  Sure.  I'll be brief.  Just the claim

7    that she's not getting value for her shares is based on

8    conversations with two colleagues who she offered to sell to

9    who declined to do so.  That alone is not sufficient to

10   perform --

11         THE COURT:  That's outside the four corners of this

12   pleading.

13         MR. CAMHI:  Again, I don't recall specifically if

14   it's in here.  I think it might be in the complaint.

15         MS. SHIELDKRET:  That's in the complaint.

16         MR. CAMHI:  But that's not a sufficient basis to say

17   that her --

18         THE COURT:  Oh, that is in the complaint.

19         MR. CAMHI:  I believe it is --

20         THE COURT:  All right.  It sounds like a contract

21   claim or --

22         MR. CAMHI:  -- to say that her shares have lost

23   value to her.  And then the second thing, and I won't belabor

24   this but I do want to go back quickly because when we were

25   talking about the Equal Pay Act there was a claim from

1    plaintiff's counsel that there were allegations that Dr.

2    Kairam was not paid, the plaintiff was not paid because she

3    was a woman.  There's nothing alleged to that effect.  There's

4    no real basis for that inference whatsoever and so I just

5    wanted to make sure that was noted.

6              THE COURT:  So the trade secret claim, are you

7    alleging that the template qualifies as a trade secret?

8              MS. SHIELDKRET:  Yes.

9              THE COURT:  And what is the -- what are the alleged

10   misappropriation that occurred?

11             MS. SHIELDKRET:  Sure.  So this all has to do with

12   billing and it just seems to me that in the context of medical

13   billing everything is confidential.  I mean that's the nature

14   of that billing.  If we need to plead that separately it can

15   be cured but every single aspect of medical billing is

16   confidential.  We're dealing with patient confidential

17   information and there's -- so there's no indication that

18   anyone thought there was anything other than confidential

19   information being used and talked about.

20             In this context what she said to them is I've

21   developed this template.  I use it to track the billing and

22   this is the way I can help with the billing committee and they

23   told her to go ahead.  And she disclosed the template to them

24   and the process for using it, how to make it effective.  So --

25             THE COURT:  And she used the template; right?

38

1          MS. SHIELDKRET:  Correct.

2          THE COURT:  To perform her work?

3          MS. SHIELDKRET:  Correct.

4          THE COURT:  For which she was supposed to be paid

5  $100,000?

6          MS. SHIELDKRET:  Correct.

7          THE COURT:  Right?  And she wasn't paid $100,000.

8          MS. SHIELDKRET:  That's right.

9          THE COURT:  So how is that misappropriation of the

10  template?

11          MS. SHIELDKRET:  Because once it's been disclosed

12  they have all the value of that.  They can use the template

13  and she's never received anything for it.

14          THE COURT:  Okay.  I understand your argument.  Did

15  you have anything you wanted to say about that because I don't

16  think you've commented on this claim yet.

17          MR. CAMHI:  Yes, briefly I would comment that we

18  believe plaintiff's counsel is conflating the idea of

19  confidential information used in medical billing including

20  social security numbers and patient information with the idea

21  of a trade secret.  What we're talking about here is a

22  template that was used that was voluntarily used while working

23  for West Side.  There was never an indication that she was --

24  that plaintiff was attempting to sell this proprietary

25  information to West Side or was allowing them to use it but

1   required them to keep it confidential.  Simply a trade secret

2   is not -- even though the template was filled in with

3   information that may have been confidential to patients it

4   doesn't transform the template itself into some sort of trade

5   secret and that's --

6          MS. SHIELDKRET:  I don't -- I understand what he's

7   saying.  What I'm saying is it's not unreasonable that

8   everyone understood that anything was related to billing

9   including a method for capture, improving capture is a trade

10  secret.  I don't think West Side is seriously disputing that.

11  What they're saying is there's -- if there needed to be some

12  sort of written agreement that we don't have one and what

13  we're saying is there didn't need to be something like that

14  that we can point to because everyone understood the nature of

15  this is -- it's a competitive environment.  If you've come up

16  with a way to get that money from insurers more efficiently

17  that is a trade secret.  It's exactly the kind of confidential

18  information that leads to a business advantage.

19         So West Side understood that and they made an

20  argument about her disclosing the template to a billing

21  company.  What we're saying is that relationship is

22  confidential information.  Anyone who works in this space

23  understands that.

24         MR. CAMHI:  There's no allegation in the complaint

25  that that relationship was confidential.  So to the extent

40

1   that it's understood in the industry I can't speak to but I

2   would also note that I don't see a particular distinction

3   between the use of this template and anything I might do to

4   make my law firm more efficient or any banker might do to make

5   their bank more efficient.  Increasing efficiency doesn't

6   automatically create a trade secret that can be the subject of

7   a trade secret's act claim.

8           MS. SHIELDKRET:  I don't think that's true.  I think

9   the definition of a trade secret is it's something that's not

10  generally known that gives you a competitive advantage.

11          THE COURT:  When did you add the trade secret claim?

12  Which version of the complaint?

13          MS. SHIELDKRET:  I think that was the latest

14  version.

15          THE COURT:  Why not in the earlier versions?  That's

16  something you were aware of; right?

17          MS. SHIELDKRET:  I don't recall, Your Honor.

18          THE COURT:  Anything else the parties would like to

19  raise?

20          MR. CAMHI:  On that issue?

21          THE COURT:  On any issue.

22          MR. CAMHI:  I'll allow plaintiff to go first.

23          MS. SHIELDKRET:  Just want to look through my notes,

24  Your Honor.

25                  [Pause in proceedings.]

41

1          MS. SHIELDKRET:  I think I would just add that the

2    harm under the ADA claim is actually happening right now

3    because it affects the terms and conditions of her employment

4    today.  The whole point about the situation being changing and

5    not being able to plan for retirement is something that

6    younger employees don't have to think about.  It doesn't

7    affect them.  It affects the older employees and it affects

8    her work now.  She's in a situation where does she start

9    scaling back which risks either being expelled at 70 or not

10   being able to take advantage of the PE deal.

11          THE COURT:  But you don't know if she's going to be

12   expelled at 70; right?

13          MS. SHIELDKRET:  They passed a policy where they can

14   do it.  It's a legal --

15          THE COURT:  Again, the answer to my question is you

16   don't know she's going to be expelled at 70; right?

17          MS. SHIELDKRET:  There is -- there were only two

18   employees in that age range.  If they didn't want to expel

19   people at 70 there was no need to pass that policy.  They

20   targeted these two employees.

21          MR. CAMHI:  I would --

22          MS. SHIELDKRET:  There's no reason why they would

23   pass that policy if they weren't going to expel people at 70.

24          MR. CAMHI:  I would note that Dr. Goldberg has not

25   been expelled from the practice.

42

1          THE COURT:  So the policy was targeted at two

2     people, one of whom wasn't terminated at age 70.

3          MS. SHIELDKRET:  Correct.

4          THE COURT:  Okay.  Anything else?

5               [Pause in proceedings.]

6          MS. SHIELDKRET:  I think a lot of what we discussed

7     today has to do with whether something in the four corners of

8     the complaint.  Certainly the retirement policy as an

9     amendment to the operating agreement is referenced in the four

10    corners of the complaint because the operating agreement was

11    included and included by reference as well as an exhibit.

12         In terms of new things, the new facts that are

13    developing, what -- that if there is any kind of defect it's

14    something that we likely can cure and under the Second Circuit

15    ruling in Lorali we should have the opportunity to do that.

16         THE COURT:  But you don't know what the facts are.

17    You said it's a developing situation.  The Court can't give

18    leave to replead subject to the PE deal closing and see what's

19    in the PE deal.  You have to have a claim and it sounds to the

20    Court like you don't.  It sounds like it's speculation.

21         MS. SHIELDKRET:  Well, there's -- there's no

22    speculation about the fact that they passed a policy that

23    everyone understands is illegal, the mandatory retirement age.

24         THE COURT:  They passed a policy that they didn't

25    apply to one of the targeted individuals -- and by the way,

43

1    I'm still not convinced that you properly plead that but let's

2    assume you do, that they passed a policy, a policy that's in

3    effect that affects people over age 70, 70 and over, and the

4    first individual to fall under that policy was kept on and

5    your client hasn't even reached age 70.

6            This other thing you're talking about, the whipsaw

7    effect and heard even to stay on for five years, et cetera, et

8    cetera, hasn't even happened.  Even assuming that's an

9    actionable discrimination claim as opposed to again some other

10   type of claim that they're changing the contractual terms

11   after your client already started working and whatever common

12   law theories may be articulated based upon that but the PE

13   deal hasn't closed.  And we don't know what the terms of that

14   deal are going to be if it closes -- if it ever closes.

15   Right?

16           MS. SHIELDKRET:  So we've -- what I'm saying is

17   we've gotten a step closer to that but in any event --

18           THE COURT:  A step closer to what?

19           MS. SHIELDKRET:  That PE has now given terms, the

20   five years, that that's a thing that we received in September.

21   So --

22           THE COURT:  But, again, the PE deal doesn't have to

23   close; right?

24           MS. SHIELDKRET:  It does not have to close but

25   there's a part of it that has already gone into effect.

44

1          THE COURT:  Which part has gone into effect?

2          MS. SHIELDKRET:  That PE received the management

3    contract for the practice.  So everyone is expecting the deal

4    to close but it hasn't closed yet.

5          THE COURT:  Okay.

6          MS. SHIELDKRET:  And that's not -- that's not in the

7    four corners of the complaint.  It just affects -- if this

8    thing -- if all that's going to happen at the end of the day

9    because PE is not -- may not be subject to jurisdiction in New

10   York State courts is that we have to refile later and bring PE

11   in then we haven't really -- you're right, that we'd have more

12   certainty about the claims but we're still -- we would just

13   have parallel litigations.  This is not going to -- it's not a

14   situation where there -- that's all going to be handled in

15   state court either.  So that's what our concern is and that --

16   and it may also be a --

17          THE COURT:  So you lost me.  So why can't you sue

18   PE?

19          MS. SHIELDKRET:  What I'm saying is I don't know if

20   PE will be subject to the jurisdiction of New York State

21   courts.

22          THE COURT:  Why would PE be subject to the

23   jurisdiction of the New York federal court if it's not subject

24   to the jurisdiction of New York State court?

25          MS. SHIELDKRET:  Because they're directing West

45

1   Side's activities.

2          THE COURT:  But if they're directing West Side's

3   activity, if that theory holds water for personal jurisdiction

4   purposes, I'm not opining that it does, that that theory holds

5   water for New York State personal jurisdiction purposes why

6   wouldn't it be -- New York federal, why wouldn't it hold water

7   for New York State?

8          MS. SHIELDKRET:  I'm just not sure about their

9   presence prior -- I mean they have some presence in New York

10  State prior to this deal.  I'm not sure -- I'm not sure what

11  the status would be like because it's going to be affected but

12  that's -- that's part of what the issue is.  We certainly --

13  the claims against PE we did file at the EEOC.

14         THE COURT:  Okay.  I will reserve decision and issue

15  a report and recommendation forthwith.

16         MS. SHIELDKRET:  Thank you, Your Honor.

17         MR. CAMHI:  Thank you, Your Honor.

18         THE CLERK:  All rise.

19                    *  *  *  *  *

20

21

22

23

24

25

46

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                                    _____

6                                    Shari Riemer, CET-805

7  Dated:  November 1, 2018