UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/9/2018
```

Indira Kairam, M.D.,

                                    Plaintiff,

                 -against-

West Side GI, LLC,

                                    Defendant.

1:18-cv-01005 (AT) (SDA)

**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE ANALISA TORRES, UNITED STATES DISTRICT JUDGE:**

Plaintiff Indira Kairam, M.D. ("Dr. Kairam" or "Plaintiff") brings this action against defendant West Side GI, LLC ("WSGI" or "Defendant") raising a variety of state and federal claims relating to her membership with WSGI. Presently before the Court is Defendant's motion to dismiss the Second Amended Complaint ("SAC"). (Mot. to Dismiss, ECF No. 34.)

For the reasons set forth below, the Court recommends that Defendant's motion to dismiss be GRANTED.

**RELEVANT FACTS[1]**

WSGI is a New York limited liability company which owns and operates an outpatient ambulatory endoscopy center located in Manhattan. (SAC, ECF No. 22, ¶ 8; Subscription Agmt., ECF No. 35-1, at 3.) Dr. Kairam began performing medical procedures at WSGI on or about

---

[1] For purposes of this motion to dismiss, the Court assumes that the well-pleaded allegations of the SAC are true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (when "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). The Court also will consider the Membership Subscription Agreement (ECF No. 35-1) and the Operating Agreement (ECF No. 48-1), which were attached in partial form to the SAC and subsequently filed by Defendant. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

September 16, 2014 (SAC ¶ 17) and entered into a Subscription Agreement with WSGI on October 30, 2014, whereby she purchased a 2.65% membership interest in WSGI for $528,121.15. (*Id*. ¶ 9; Subscription Agmt. at D-3.)[2] Dr. Kairam alleges that for "4 to 6 months" following the start of her relationship with WSGI, she was in a "transition period," pending her accreditation by the New York State Department of Health. (*See id*. ¶ 17.) During that time period, Dr. Kairam performed procedures for WSGI, but received less compensation than she would have if she had performed the procedures on her own. However, WSGI represented to Dr. Kairam that "she would be compensated so there would be no decrease in her income." (*Id*. ¶¶ 17-18.)

WSGI obtained an independent valuation of its business in the Autumn of 2016 in connection with a transaction where the physician members of WSGI acquired the private practice of Dr. Gould (the "Gould Practice"). (*Id*. ¶ 12.) Based upon this valuation, the WSGI "Board Members" agreed that Dr. Kairam "had been overcharged for her interest," and agreed that her "units should be increased to reflect the purchase price at the proper valuation." (*See id*. ¶ 13.) Dr. Kairam also alleges that in 2016 she was promised compensation for monies she lost during the transition period (SAC ¶ 21) because WSGI induced her to perform endoscopic procedures at WSGI that she could have performed at her own office. (*Id*. ¶ 19.) Dr. Kairam "had suffered a loss of almost 20% in fees per procedure." (*Id*.)

In the autumn of 2016, to satisfy promises for additional monies and to discourage Dr. Kairam from following through on her threats to leave WSGI, WSGI "promised to resolve the

---

[2] For the purposes of this motion, the Court assumes that Dr. Kairam is an "employee" of WSGI. *Cf. Clackamas Gastroenterology Assocs., P.C. v. Well*, 538 U.S. 440, 451 (2003) (determination of whether individual is "employee" under applicable anti-discrimination laws is "fact intensive" inquiry that "depends on all of the incidents of the relationship with no one factor being decisive.") (internal quotation marks omitted).

outstanding issues," and offered her employment with WSGI to "perform administrative duties," for which she would be compensated at the rate of $100,000/year for a term of two years. (*See id*. ¶¶ 22-23.) Dr. Kairam alleges that, in performing the administrative duties "[o]ver a period of months," she provided WSGI with a template she had developed with another company, but that she never was compensated for her services. (*Id*. ¶ 24.) By contrast, Dr. Distler, a "younger male," in the autumn of 2016, began receiving a salary of $100,000/year for two years" to "run the Gould Practice," which "involved administrative duties at WSGI." (*Id*. ¶ 25.)

Dr. Kairam further alleges that she and Dr. Myron Goldberg, a doctor over the age of 70, were not referred cases from the Gould Practice.[3] (*Id*. ¶¶ 28, 30). Dr. Kairam asked why she was not referred cases, and was told that patients of that practice preferred to be seen by doctors that "look like" Dr. Gould, a white male. (*Id*. ¶ 29.)

Dr. Kairam alleges that, in August 2017, the WSGI Board told members that it had voted in favor of a retirement policy for members at the age of 70. (*Id*. ¶ 30.) She further alleges that "the policy would allow doctors over 70 to continue to practice subject to an annual review." (*Id*.) In October 2017, Physicians Endoscopy Health Associates ("PEHA") issued a Letter of Intent for PEHA to acquire 49% of WSGI. (*Id*. ¶ 33.) Dr. Kairam asserts that the mandatory retirement policy and one term of the proposed transaction requiring a seven-year work commitment from members combined to discriminate against doctors near age 70, including herself (who is 67), by forcing divestiture of their interests in WSGI at an unfavorable price. (*See id*. ¶¶ 35-36, 38-40.)

---

[3] Paragraph 28 of the SAC alleges that referrals were not made "to the two doctors near the newly-enacted retirement age, including Dr. Kairam." (SAC ¶ 28.) A male doctor, Dr. Myron Goldberg, who is alleged to be over 70 years of age, is mentioned in paragraph 30 of the SAC. (*See id*. ¶ 30.) Plaintiff's counsel confirmed during oral argument that the other doctor referred to in paragraph 28 is Dr. Goldberg, a white male. (Tr. at 13-14.)

**PROCEDURAL HISTORY**

Plaintiff commenced this action on February 5, 2018. (Compl., ECF No. 1.) Her initial Complaint contained ten counts, arising under New York statutory and common law. (*Id.* ¶¶ 40-74.). At that time, Plaintiff sought to invoke subject matter jurisdiction based upon diversity of citizenship, 28 U.S.C. § 1332. (*Id.* ¶ 5.) However, since WSGI is a limited liability company, District Judge Torres ordered Plaintiff to amend her Complaint to allege the citizenship of "natural persons who are members of the limited liability company and the place of incorporation and principal place of business of any corporate entities who are members of the limited liability company." (2/6/18 Order, ECF No. 3.)

On February 28, 2018, Plaintiff filed an Amended Complaint and, instead of pleading diversity jurisdiction, added a federal law claim for violations of the Equal Pay Act ("EPA"), thereby seeking to invoke subject matter jurisdiction under 28 U.S.C. § 1331. (Am. Compl., ECF No. 4, ¶¶ 3-4.)[4] On May 14, 2018, WSGI filed a pre-motion letter with the Court explaining why her EPA claim lacked merit. (Def.'s 5/14/18 Ltr., ECF No. 16.) Plaintiff then sought leave to file another amended pleading, which was granted by Judge Torres on May 16, 2018. (5/16/18 Memo Endorsement, ECF No. 19.) Judge Torres ordered that Plaintiff file on the docket her amended pleading and any exhibits by May 23, 2018. (*Id.*)

Plaintiff filed her SAC on May 24, 2018.[5] (SAC, ECF No. 22.) The SAC adds for the first time

---

[4] Defendant posits in its dismissal memorandum that Plaintiff "does not plead diversity jurisdiction because Plaintiff and certain members of WSGI are both citizens of the same state." (Def.'s Mem. L. in Support of Mot. to Dismiss ("Def.'s Mem."), ECF No. 36, at 4 n.2.)

[5] Thus, the SAC was filed one day late. (*See* SAC, ECF No. 22 (with Clerk's notation of "Deficient Pleading"); *see also* 5/25/18 Clerk's Notice to Attorney regarding deficient pleading: "Court's leave has not been granted. Time granted has passed.").

claims under three federal statutes in addition to the EPA: Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA") and the Defend Trade Secrets Act ("DTSA"). (*See* SAC ¶¶ 42-47, 60-62.)

On June 14, 2018, Defendant filed a motion to dismiss the SAC. (Mot. to Dismiss, ECF No. 34.) Plaintiff filed her opposition memorandum on July 7, 2018 (Pl.'s Mem. L. in Opp. to Mot. to Dismiss ("Opp."), ECF No. 46), and Defendant filed its reply memorandum on July 13, 2018. (Mem. L. in Further Support Mot. to Dismiss ("Reply Mem."), ECF No. 47.) On August 27, 2018, this case was referred to me for general pretrial purposes. (Order of Reference, ECF No. 67.) On October 5, 2018, Defendant's motion to dismiss the SAC (ECF No. 34) was referred to me for a Report and Recommendation. (Am. Order of Reference, ECF No. 77.) I held oral argument on Defendant's motion on October 29, 2018. (*See* Tr., ECF No. 79.)

## DISCUSSION

### I.    Rule 12(b)(6) Legal Standard

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. The Court "must accept as true all of the factual allegations contained in the complaint[,]" but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* (citation omitted). Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id; see also Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) ("we are not required to credit conclusory allegations or legal conclusions couched as factual allegations.") (citing *Twombly*, 550 U.S. at 555, 557).

II.    **Plaintiff's EPA Claim Should Be Dismissed**

Defendant argues that Plaintiff does not plead a plausible EPA claim because she does not allege a pay disparity or that the job she performed was substantially equal to that of her alleged comparator. (Def.'s Mem. at 5-7.)

The EPA prohibits an employer from "paying wages to employees in [an] establishment [engaged in commerce] at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). To prove an EPA violation, "a plaintiff must demonstrate that [(1)] the employer pays different wages to employees of the opposite sex; [(2)] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [(3)] the jobs are performed under similar working conditions." *EEOC v. Port Authority of N.Y. and N.J.*, 768 F.3d 247, 254-55 (2d Cir. 2014) (internal quotation marks omitted) (alterations in original). Applying this standard, the Court agrees that Dr. Kairam has failed to adequately plead an EPA claim.

First, the Court finds that Dr. Kairam has not pleaded that WSGI paid different wages to employees of the opposite sex. Dr. Kairam alleges that, in order to induce her not to leave WSGI for another endoscopy center, she was offered employment with WSGI to perform

administrative duties, for which she would be compensated $100,000 per year for a term of two years. (SAC ¶¶ 22-23.) This position and salary were approved by the Board. (SAC ¶ 26). She further alleges that Dr. Distler, her alleged comparator, was paid a salary of $100,000 per year "to run the Gould Practice, which involved administrative duties at WSGI." (SAC ¶ 25.) Thus, Plaintiff does not dispute that WSGI set the salary for both positions at the same amount. (*See* Opp. at 10 (citing SAC ¶¶ 22-25, 28).)

Nonetheless, Dr. Kairam contends that WSGI violated the EPA because it "willfully, purposefully and intentionally failed to pay Dr. Kairam her salary because of her sex, while paying a comparably employed male doctor his salary."[6] (SAC ¶ 49.) Plaintiff argues that promising to pay an equal wage is not the same thing as actually paying an equal wage and cites to *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974), for the proposition that a company cannot rely on "nominally setting the wages equal." (Opp. at 8.) However, in *Corning*, the company did not promise to pay equal wages and then simply not pay its female workers, nor were the wages nominally equal. *See Corning*, 417 U.S. at 209-10. Instead, the company paid higher "red circle" wages to employees who previously had worked on the night shift, which had not been open to women, which the Court found "perpetuated the effects of the company's prior illegal practice of paying women less than men for equal work." *Id.* Indeed, the Court recognized that the purpose of the EPA was to remedy "the fact that the *wage structure* of 'many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same.'" *Corning*

---

[6] To the extent that Plaintiff also raises a Title VII pay discrimination claim, that claim is addressed in Section III(C)(1), *infra*.

417 U.S. at 195 (citing S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)) (emphasis added). Thus, while Dr. Kairam may have other avenues of legal recourse to recover the money she alleges that she is owed, her allegations are insufficient to state a claim under the EPA. *See Brands-Kousaros v. Banco Di Napoli S.P.A.*, No. 97-CV-01673 (DLC), 1997 WL 790748, at *6 (S.D.N.Y. Dec. 23, 1997) (dismissing EPA claim because, *inter alia*, plaintiff had not identified any male employee who was given preferential compensation).

Second, even if Dr. Kairam could establish that she was paid a different wage, she has not adequately alleged that she and Dr. Distler performed equal work in a job requiring equal skill, effort and responsibility, and that their two jobs were performed under similar working conditions.[7] At the pleading stage, "a plausible EPA claim must include sufficient factual matter, accepted as true to permit the reasonable inference that the relevant employees' job content was substantially equal." *Port Authority,* 768 F.3d at 256. (internal quotation marks omitted). This standard is "demanding" and requires that a plaintiff "establish that the jobs compared entail common duties or content, and do not simply overlap in titles or classifications." *Id.* at 255 (internal citation omitted). Broad generalizations drawn from job titles, and conclusory assertions of sex discrimination, do not suffice. *Id*. at 256.

---

[7] Regulations promulgated by the EEOC "provide the relevant criteria in determining whether two positions are sufficiently 'equal' and operationalize the 'skill, effort, responsibility, and similar working conditions' referenced in the statute." *Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363*, No. 15-CV-03363 (NSR), 2018 WL 2416568, at *6 (S.D.N.Y. May 29, 2018) (citing 29 C.F.R. § 1620). Under the regulations, skill "includes consideration of such factors as experience, training, education, and ability; effort "is concerned with the measurement of the physical or mental exertion needed for the performance of a job" and responsibility refers to "the degree of accountability required in the performance of a job, with emphasis on the importance of the job obligation." 29 C.F.R. §§ 1620.15-1620.17. "Similar working conditions" refer to "surroundings" and "hazards." 29 C.F.R. § 1620.18(a).

Although Dr. Kairam alleges that both jobs involved "administrative duties" (SAC ¶¶ 23, 25), she does not allege any facts regarding common duties or job content, which are necessary to state an EPA claim. *See Eng v. City of New York*, 715 F. App'x 49, 52 (2d Cir. 2017) (summary order) (upholding dismissal of EPA claim where plaintiff failed to provide factual allegations about her or the comparators' job duties, skills, efforts or responsibilities); *accord Verdone v. Am. Greenfuels, LLC*, No. 16-CV-01271 (VAB), 2017 WL 3668596, at *6 (D. Conn. Aug. 24, 2017) (a plaintiff must provide more than "scant information" to state a claim under the Equal Pay Act) (internal citation omitted).

For these reasons, I recommend that Plaintiff's EPA claim be dismissed.

**III.   Plaintiff's ADEA And Title VII Claims Should Be Dismissed**

Defendant contends that Plaintiff's ADEA and Title VII claims should be dismissed because she failed to exhaust her administrative remedies. (Def.'s Mem. at 7-8.) Defendant also contends that Plaintiff's ADEA claim should be dismissed because it is speculative and not ripe for adjudication, and her Title VII claim fails to allege evidence of intentional discrimination. (Def.'s Mem. at 8-11.) For the reasons set forth below, I recommend that Plaintiff's ADEA and Title VII claims be dismissed.

**A.   Exhaustion Of Administrative Remedies**

Prior to bringing an ADEA or Title VII claim in federal court, a plaintiff must "first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (citing 42 U.S.C. § 2000e-5(e) and (f)) (additional citation omitted) (Title VII); *see also* 29 U.S.C. § 626(d) ("[n]o civil action . . . be commenced . . . until 60 days after a charge alleging unlawful discrimination has been filed with

the [EEOC].") (ADEA).  In a Title VII case, a plaintiff must receive a "Notice of Right to Sue" letter from the EEOC before bringing suit. *See Williams v. New York City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006). In contrast, an ADEA plaintiff need not wait for a right to sue letter from the EEOC before filing suit. *See Holowecki v. Fed. Exp. Corp.*, 440 F.3d 558, 563 (2d Cir. 2006) (comparing 29 U.S.C. § 626(d)-(e) with 42 U.S.C. § 2000e-5(e)-(f)), *aff'd*, 552 U.S. 389 (2008); *see also Pennyfeather v. New York City*, No. 99-CV-02580 (DAB) (AJP), 2000 WL 1161081, at *1 (S.D.N.Y. Aug. 16, 2000) (an "ADEA plaintiff can sue in court even if the EEOC has not yet completed its investigation or attempts at conciliation.") (citing *Hodge v. New York College of Podiatric Med.*, 157 F.3d 164, 167-68 (2d Cir. 1998)).

However, while exhaustion of administrative remedies is a precondition to bringing ADEA and Title VII claims, exhaustion is not a jurisdictional requirement. *See, e.g., Hardway*, 879 F.3d at 490 (quoting *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000)); *see also Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 385 (2d Cir. 2015) ("the question whether [plaintiff] properly exhausted his claims is not free from uncertainty, but this ambiguity has no bearing on the subject matter jurisdiction of the District Court.") (internal quotation marks omitted). Thus, "it is subject to equitable defenses." *Fowlkes*, 790 F.3d at 385. Moreover, the burden of pleading and proving exhaustion lies with defendants and operates as an affirmative defense. *Id.* at 491. "An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Frederic v. NFC Amenity Mgmt., et al.*, No. 17-CV-05769 (AJN), 2018 WL 4735715, at *2 (S.D.N.Y. Sept. 28, 2018) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

Here, the SAC alleges that Plaintiff filed a charge with the EEOC "for the ADEA and Title VII claims," but had "not yet received a charge number." (SAC ¶ 41.) While the SAC does not state the date that Plaintiff filed the charge, in her opposition papers Plaintiff states that she filed it on May 23, 2018, one day prior to filing this lawsuit. (Opp. at 11, n.1.) The Court finds that it is appropriate to consider this date, even though the charge itself was not attached to the SAC. *See Massaro v. Dep't of Educ. of City of New York*, No. 17-CV-08191 (LGS), 2018 WL 4333989, at *2 (S.D.N.Y. Sept. 11, 2018) ("When assessing whether a plaintiff has exhausted her administrative remedies at the motion to dismiss stage, courts can rely on EEOC filings to adjudicate the motion, even when they are not attached to the complaint, because plaintiffs rely on these documents to satisfy the ADEA's administrative exhaustion requirements.") (citing *Holowecki*, 440 F.3d at 565) (additional citation omitted). Thus, the Court finds that, because sixty days have now passed since Dr. Kairam filed her EEOC charge, the exhaustion defect as to her ADEA claim has been cured.[8] As for Plaintiff's Title VII claim, the Court finds that that there are insufficient facts to determine whether or not the failure to exhaust should be excused or waived.[9] *See Fowlkes*, 790 F.3d at 387 n.9 (remanding for District Court to determine whether plaintiff's failure to exhaust could be excused); *Boos v. Runyon*, 201 F.3d 178, 183 (2d Cir. 2000) (because "failure to wait" is not a jurisdictional flaw, the court "may waive it, in appropriate circumstances" including in the

---

[8] While the Court recognizes that the purpose of requiring would-be plaintiffs to file their ADEA claims with the EEOC is frustrated if plaintiffs willingly forgo this requirement with the knowledge that any defect is likely to be cured by the time a district court rules on a motion to dismiss, the Court finds that dismissal on this ground would serve no purpose since Plaintiff could immediately re-file her claim.

[9] Plaintiff's argument that alleged retaliation that occurred after she filed the EEOC charge means that a new charge does not need to be filed is not on point as it does not relate to the timeliness of the lawsuit vis-à-vis the original claims. (*See* Opp. at 14; Reply Mem. at 2-3.)

interest of judicial economy). Nonetheless, the Court need not undergo this analysis because I recommend that Plaintiff's discrimination claims be dismissed for the reasons set forth below.[10]

### B.    Plaintiff's ADEA Claim Is Not Ripe

The ADEA makes it unlawful for an employer to, *inter alia*, "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623. To state a claim under the ADEA, a plaintiff must allege that: "(1) she was within the protected age group; (2) she was qualified for the position; (3) she experienced adverse employment action; and (4) such action occurred under circumstances giving rise to an inference of discrimination." *Silberman v. Atl. Dialysis Mgmt. Servs., LLC*, No. 17-CV-07019, 2018 WL 4335510, at *3 (S.D.N.Y. Sept. 11, 2018) (internal quotation omitted) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)).

Here, Dr. Kairam's age discrimination claims are based on two purported actions by WSGI: (1) the implementation of a policy that required mandatory retirement for members at the age of seventy, and (2) a deal with PEHA that would require doctors to work for seven years. (SAC ¶¶ 30-39.) First, with respect to the mandatory retirement age, Dr. Kairam alleges that by August 2017, "the WSGI Board began telling members that it had voted to institute a policy that required mandatory retirement for members (and cashing out their units for the value in their capital accounts) at the age of 70." (SAC ¶ 30.) Based on that vote, Plaintiff argues that the policy was

---

[10] Moreover, as soon as Dr. Kairam receives a right to sue letter, any exhaustion defect will be cured. *See Brunson-Bedi v. New York*, No. 15-CV-09790 (NSR), 2018 WL 2084171, at *4 (S.D.N.Y. May 1, 2018) (plaintiff's receipt of right to sue letter, even though issued and received after the initiation of lawsuit, rendered any prior exhaustion defects cured).

implemented because, under Section 12.8 of the Operating Agreement, the "sole mechanism" for amending the Agreement is by a vote of the Board. (Opp. at 11.) However, under the Operating Agreement, any amendment requires "an instrument in writing executed by a Super-majority of the Board." (Op. Agr. § 12.8, ECF No. 48-1.) Thus, the Board's vote alone is insufficient, and Dr. Kairam does not point to any written instrument.

In any event, even assuming the policy has been implemented, Dr. Kairam's claim is not ripe for review. Dr. Kairam was sixty-seven years old at the time she filed this lawsuit and has not been affected by the mandatory retirement policy. Nor is it clear that she ever will be. Dr. Kairam alleges that "the Board stated that the policy would allow doctors over 70 to continue to practice subject to annual review[.]"[11] (SAC ¶ 30). Thus, Dr. Kairam has not presented a "real and substantial controversy admitting of specific relief[.]" *Auerbach v. Bd. of Educ. of the Harborfields Cent. Sch. Dist. of Greenlawn*, 136 F.3d 104, 108-09 (2d Cir. 1998) (affirming dismissal of school employees' claim that the district's retirement incentive policy violated the ADEA as unripe because they had not yet retired and, therefore, had not been denied any incentive benefits paid to their younger colleagues under the plan) (citing *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)). Instead, her claim rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). Dr. Kairam may decide to leave WSGI for any number of reasons between now and when she turns

---

[11] Dr. Kairam also argues that the annual review is a discriminatory condition of employment, but there are no allegations that such a requirement was imposed. (*See* SAC ¶ 30 (referring to what was "stated" by the Board following an alleged protest by Dr. Goldberg).) Moreover, whether and how any such review would be imposed is precisely the type of abstract dispute that is not ripe for review.

seventy, or she may be allowed to remain a member of WSGI despite any retirement policy that may otherwise exist.

Dr. Kairam argues that she already has been affected by the policy because "choosing to leave instead of facing the discriminatory retirement age will trigger a non-compete" provision that will prohibit her from working anywhere in Manhattan for one year. (Opp. at 12.) She further argues that the policy "has negatively affected the amount her colleagues were willing to pay for her shares and practice" and that it restricts her ability to bring on a colleague to take over her practice. (*Id.*) However, these arguments are purely speculative because Dr. Kairam has not chosen to leave WSGI, nor sold her shares or her practice.

For the same reason, any claim based on the alleged deal with PEHA and any requirements that may or may not be imposed in accordance with such a deal, is purely hypothetical. The SAC does not allege that the PEHA deal ever closed, but refers to it as "the proposed sale to PE[HA]," (*id*. ¶ 38), and elsewhere refers to "any sale of units to PE[HA]." (*Id*. ¶ 35.) Therefore, any claim based upon the proposed PEHA deal, which may never happen or may happen on different terms, is not ripe for review.

For these reasons, I recommend that Dr. Kairam's ADEA claims be dismissed.

## C.   Plaintiff Has Not Plausibly Alleged A Title VII Claim

Defendants argue that Plaintiff's Title VII claims should be dismissed for the additional reason that she has failed to plead any evidence of discriminatory intent. (Def.'s Mem. at 8-10.)

To survive a motion to dismiss in a Title VII case, "the plaintiff does not need substantial evidence of discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see also Rogers v. Fashion Inst. of Tech.*, No. 14-CV-06420 (AT), 2016 WL 889590, at *5 (S.D.N.Y.

Feb. 26, 2016) ("The *prima facie* case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement.") (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002)). However, "absent direct evidence of discrimination," the plaintiff must allege facts that plausibly support "that the plaintiff is a member of a protected class, was qualified, [and] suffered an adverse employment action." *Littlejohn*, 795 F.3d at 297. Further, the complaint must contain "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Id*. "Although a plaintiff is not required to plead a *prima facie* case to withstand dismissal, the elements of a *prima facie* case may be used as a prism to shed light upon the plausibility of the claim." *Rogers*, 2016 WL 889590, at *5 (internal quotation omitted).

### 1.    Pay Discrimination Claim

First, Dr. Kairam alleges that "Dr. Distler unilaterally prevented WSGI personnel from paying any salary" to her for the administrative work that she performed. (SAC ¶ 27.) While Dr. Kairam primarily styles this argument as an EPA violation, a claim of unequal pay for unequal work also can be brought under Title VII. The requirements for pleading such a claim are "generally the same" as those under the EPA, except that the Title VII plaintiff "must also produce evidence of discriminatory animus." *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995)). Here, there are no allegations to support Plaintiff's conclusory statement that the alleged failure to compensate Dr. Kairam for her administrative work was because of her sex. Indeed, Dr. Kairam alleges that the Board voted to approve her salary, which she alleges was set at the same rate as Dr. Distler's. (SAC ¶ 26.) Moreover, it appears based upon the allegations of the SAC that Dr. Kairam continued to receive income as a member of WSGI. Because Dr. Kairam has not shown even minimal support for the

proposition that WSGI was motivated by discriminatory intent, I recommend that her Title VII claim of pay discrimination be dismissed.

**2.**     <u>**Referrals From Gould Practice**</u>

Dr. Kairam also alleges that she was discriminated against because of her sex, color and/or national origin because she and Dr. Goldberg were not referred cases from the Gould Practice. (SAC ¶¶ 28-29.) She further alleges that, during a meeting of WSGI doctors, when she asked why she was not referred cases from the Gould Practice, she was told by Dr. Distler, a WSGI Board member, that Dr. Gould's patients wanted "to see a doctor that 'looks like' Dr. Gould," who was a white male. (SAC ¶ 29.) However, even assuming that the alleged comment by Dr. Distler provides minimal support for the proposition that WSGI was motivated by discriminatory intent, the Court finds that Plaintiff's Title VII claims should be dismissed because she does not adequately allege that she has suffered an adverse employment action for Title VII purposes.

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment[,]" such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Silberman*, 2018 WL 4335510, at *3 (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). There is no indication in the SAC as to how many of Dr. Gould's patients were treated by other WSGI doctors, or if the volume of patients that Dr. Kairam treated overall was lower than the number of patients treated by other WSGI doctors as a result of the lost referrals. Nor does Dr. Kairam allege that the loss of referrals impacted her compensation. To the contrary, during oral argument her counsel confirmed that "she received

16

income in proportion to her ownership interest in WSGI, not the cases she performed." (Tr. at 14.) Thus, she has not plausibly alleged an adverse employment action. *See Martin v. Dupont Flooring Sys., Inc.*, No. 01-CV-02189 (SRU), 2004 WL 1171208, at *3 (D. Conn. May 25, 2004) (supervisor's effort to obtain all sales referrals did not amount to adverse employment action when no evidence that such behavior damaged plaintiff's earning potential); *see also Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 406 (S.D.N.Y. 2014) (allegation that plaintiff was denied overtime insufficient to substantiate an adverse employment action when no indication that she suffered loss in compensation or other material harm as a result).

For this reason, I recommend that Plaintiff's Title VII claims be dismissed.

## IV.   Plaintiff's DTSA Claim Should Be Dismissed

Finally, Defendants move to dismiss Plaintiff's DTSA claim on the ground that she fails to state a plausible claim for trade secret misappropriation. (Def.'s Mem. at 12-13.)

Enacted in 2016, the DTSA creates a private right of action for the misappropriation of trade secrets. 18 U.S.C. § 1836(b)(1). The DTSA defines "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information" that an owner has taken "reasonable measures" to keep secret and that "derives independent economic value," from "not being generally known" or "readily ascertainable" to others who could obtain economic value from its disclosure or use. 18 U.S.C. § 1839(3).

Here, Dr. Kairam has not adequately alleged that her billing template is a trade secret.[12] Dr. Kairam's DTSA claim is based upon her "trade secrets for optimizing medical billing for a GI

---

[12] In her Opposition Memorandum, Dr. Kairam discusses her expertise in medical billing and revenue cycle management, and the analyses she undertook on behalf of WSGI. (Opp. at 17.) However, any expertise that Dr. Kairam obtained and any work done is not relevant to the DTSA claim, which is focused solely on

practice." (SAC ¶ 61.) The SAC alleges that Dr. Kairam "provided WSGI with a template she had developed with an outside [Revenue Cycle Management] start-up for her practice to optimize billing." (*Id*. ¶¶ 23-24.) However, nowhere does she delineate sufficient information about the nature, value and measures taken to safeguard the template to support an inference that such template qualifies as a trade secret. *See Universal Processing, LLC v. Zhuang*, No. 17-CV-10210 (LTS), 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018) ("While it is not necessary to disclose every detail of an alleged trade secret in a complaint, the pleading standard set forth in *Twombly* and *Iqbal* requires that the complaint allege facts sufficient to identify the information for which protection is claimed and sufficient information about its nature, value, and measures taken to safeguard it to support an inference that the information qualifies as a trade secret."). In particular, Dr. Kairam does not allege any facts regarding her efforts to maintain the secrecy of her billing template. *See Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17-CV-08677 (AT), 2018 WL 3407702, at *12 (S.D.N.Y. Feb. 7, 2018) (surgical technique failed to acquire trade secret protections "because it is not a secret.") (citing 18 U.S.C. § 1839(3)(A) (limiting a trade secret to where "the owner thereof has taken reasonable measures to keep such information secret")).

Even assuming Dr. Kairam's template is a trade secret, she has not alleged that it was misappropriated by WSGI. As relevant here, misappropriation under the DTSA includes the "disclosure or use" of a trade secret without the express or implied consent of the owner by a person who used improper means to acquire knowledge of the trade secret or, at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was

---

whether WSGI used improper means to acquire a "trade secret" owned by Dr. Kairam.

acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret. *See* 18 U.S.C. § 1839(5).

First, there are no allegations that WSGI acquired the template by improper means, such as "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means[.]" 18 U.S.C. § 1839(6). To the contrary, Dr. Kairam alleges that she provided the template to WSGI. *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 523 (S.D.N.Y. 2017) (no evidence that defendants improperly acquired the purported trade secrets when defendants were customers of plaintiff when they first acquired the relevant information). Nor does Dr. Kairam allege that WSGI disclosed or continued to use of her template without her consent, let alone that it had a duty to maintain the secrecy of the template or limit its use. *See Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 567 (S.D.N.Y. 2016) (no misappropriation when plaintiff failed to show that defendant would use pricing information in breach of an agreement or confidential relationship).

For these reasons, I recommend that Plaintiff's DTSA claim be dismissed.

## V.      The Court Should Decline To Exercise Supplemental Jurisdiction

A district court has discretion as to whether it should exercise supplemental jurisdiction over state law claims when all federal claims have been dismissed. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 83 (2d Cir. 2018). A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the

remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 349-50 (1988)).

Although Plaintiff sought to base this Court's subject matter jurisdiction on diversity of citizenship in her initial Complaint, she abandoned that jurisdictional predicate in her amended pleadings.  Thus, the sole basis for subject matter jurisdiction in this Court is Plaintiff's federal law claims. *See* 28 U.S.C. § 1331. Because I recommend that Plaintiff's federal claims be dismissed, and judicial economy, convenience, fairness or comity would not be served by the Court's exercise of supplemental jurisdiction over any state law claims pled by Plaintiff, *see Zhi Guo v. Independent Chinese Pen Center, Inc.*, Case No. 10-CV-6444 (AT) (JLC), 2015 WL 4940091, at *5 (S.D.N.Y. Aug. 13, 2015), I also recommend that the Court decline to exercise supplemental jurisdiction over those claims, thereby dismissing them. *See Palmer v. Trump Model Mgmt., LLC*, 175 F. Supp. 3d 103, 109 (S.D.N.Y. 2016); *Kane v. 24/7 Real Media*, Case No. 14-CV-2482 (AT) (JLC), 2015 WL 1623832, at *2 (S.D.N.Y. Apr. 7, 2015). In this Court's view, this case belongs in state court.

**VI.   Plaintiff Should Not Be Given Further Leave To Amend Her Federal Law Claims**

In her opposition, Plaintiff requests leave to amend, pursuant to Federal Rule of Civil Procedure 15, "[s]hould the Court find any insufficiency in the pleading." (Opp. at 30.) However, nothing contained in Plaintiff's Opposition Memorandum or articulated by Plaintiff's counsel during the lengthy oral argument indicates to the Court that any of Plaintiff's federal claims are

viable.  Thus, I recommend that leave to amend be denied. *See Cuoco v. Moritsugu*, 222 F.3d 99,

112 (2d Cir. 2000) (denying "futile" request to replead).

## CONCLUSION

For the foregoing reasons, the Court recommends that Defendant's motion to dismiss be

GRANTED.

DATED:        November 9, 2018
              New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**

\*            \*            \*

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation

to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of

Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is

made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's

objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such

objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing

objections must be addressed to Judge Torres.

**THE FAILURE TO FILE THESE TIMELY OBJECTIONS WILL RESULT IN A WAIVER OF THOSE**

**OBJECTIONS FOR PURPOSES OF APPEAL.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b);

*Thomas v. Arn,* 474 U.S. 140 (1985).